UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANTHONY J. CAVANAGH, Individually )
and as Administrator of the Estate )
of Gina M. Scopa,                  )
                                   )
            Plaintiff,             )
                                   )   CIVIL ACTION NO.
                                   )   12-10745-DPW
        v.                         )
                                   )
CHRISTOPHER TARANTO,               )
DANA FITZPATRICK,                  )
DANIEL FITZGIBBON, and             )
JAMES COPPINGER,                   )
                                   )
            Defendants.            )

MEMORANDUM AND ORDER
March 31, 2015


On May 4, 2009, Gina Scopa, then a pretrial detainee at the

Suffolk County House of Correction ("HOC"), committed suicide by

hanging herself in her cell in the medical housing unit.  Her

son, Anthony Cavanagh,[1] individually and as administrator of Ms.

Scopa's estate, initiated this suit against certain HOC

administrators and correctional officers under the federal Civil

Rights Act, 42 U.S.C. § 1983, and certain state laws.  As a

result of motion to dismiss practice, the two administrator

defendants were terminated from the case and several of the

---

[1] Although the plaintiff's name is spelled "Cavanaugh" in some of
the filings, it appears that the proper spelling is "Cavanagh."

1

claims were dismissed, leaving only the § 1983 claims in issue.
The remaining defendants, who have been sued in their individual
capacities, are four correctional officers employed by the
Suffolk County Sheriff's Department who were on duty on the day
of Ms. Scopa's suicide: Officers Christopher Taranto, Dana
Fitzpatrick, Daniel Fitzgibbon, and James Coppinger.

Cavanagh asserts that these defendants were deliberately
indifferent to Ms. Scopa's mental health and safety needs, in
violation of her Fourteenth Amendment due process rights.  The
defendants now move to strike the report of the plaintiff's
expert, Melvin Tucker, from the summary judgment record and for
summary judgment in their favor.

## I. BACKGROUND

### A.  *Factual Background*

#### 1.  Ms. Scopa's Initial Intake at the House of Correction

On April 28, 2009, Ms. Scopa was detained by the Boston
Police Department and placed into the custody of the HOC.  Nurse
Claire Diaz completed an intake process with Ms. Scopa on her
arrival at the HOC, during which she reviewed Ms. Scopa's mental
health history and completed a standard intake form.  Ms. Scopa
reported a history of a mental health disorder, denoted on the

intake form as "major depression,"[2] as well as use of psychotropic medication and benzodiazepines, including Klonopin, Neurontin, and Methadone HCI, the last of which she had taken the day prior. However, she also reported that she had no history of suicide attempts and that she did not demonstrate any of the warning signs of suicide risk, including feeling hopeless or helpless, thoughts of hurting herself, a recent significant loss, or a family history of suicide.

Diaz determined that Ms. Scopa did not require critical observation and did not place Ms. Scopa on suicide watch, but did refer her for a routine mental health assessment. Detainees with intake forms like Ms. Scopa's were considered low priority referrals for the mental health clinicians; accordingly, Ms. Scopa would not have been evaluated right away if there were referrals pending for higher priority inmates. Given her low priority status, Ms. Scopa never received this mental health evaluation.

---

[2] The parties dispute whether the indication that Ms. Scopa had been diagnosed with "major depression" accurately depicts Ms. Scopa's clinical diagnosis. The defendants assert that it was Diaz's understanding that this box could be checked on the form where an inmate suffered from any form of depression – not necessarily major depression – whereas Cavanagh contends that Diaz would only check the box if Ms. Scopa suffered from major depression. The parties agree, however, that an individual can be depressed without presenting a risk of hurting herself.

## 2. Medical Housing Unit Policies and Staffing

The medical unit of the HOC consists of two areas: a clinic for treatment of regularly housed inmates, and a medical housing unit. The medical housing unit employs two forms of mental health watches: one consisting of a one-on-one watch where an officer maintains visual contact of the inmate, and the other consisting of checks by an officer on an inmate every fifteen minutes. For inmates who are placed on suicide watch, a suicide prevention policy governs monitoring and treatment of the inmate. Classification for mental health watch is made by the mental health clinicians; correctional officers do not have access to inmates' medical or mental health records. The officers perform one-on-one observations, as directed by the mental health clinicians, but also may be asked to assume the responsibilities of a standard correctional officer in the unit on a break.

When an inmate is admitted to the unit for mental health reasons, the mental health clinicians complete a checklist indicating items that cannot be brought into the cell. Inmates who are not on mental health watch may bring any property they have on their person into the medical housing unit.

On May 4, 2009, Fitzgibbon was stationed at the front of the infirmary, in the clinic section, and was tasked with

operating the doors connecting the medical housing unit to the clinic.  At no point in the relevant time period did Fitzgibbon leave this post.  At approximately 3:00 p.m., Taranto – a security supervisor - and Coppinger began their shifts in the medical housing unit.  At 3:40 p.m., Fitzpatrick reported to the unit to conduct a one-on-one observation of an inmate.

> 3.  Ms. Scopa's Admission to the Medical Unit and Subsequent Death

Ms. Scopa was admitted to the medical housing unit at or around 2:45 p.m. on May 4, 2009, due to recurrent challenges in undergoing methadone detoxification.[3]  Nurse Tatiana Musandipa, who evaluated Ms. Scopa on her arrival at the unit, considered her primary health issue to be dehydration and the purpose of her admittance to ensure that she remained hydrated despite vomiting.  Musandipa did not observe any signs of suicidal ideation and did not place Ms. Scopa on mental health or suicide watch within the unit.

Accordingly, Ms. Scopa was not subject to the special processes or policies applicable to those on mental health or suicide watches.  She was placed in cell #16, which is not designated for mental health watches, and she was permitted to bring any property she had on her person into the unit,

---

[3] After intake on April 28, Diaz assigned Ms. Scopa to the medical housing unit for drug detoxification.  She was transferred to a regular female housing unit two days later.

including her shoes and shoelaces. She was to be checked by way of officer-conducted rounds at irregular intervals every thirty minutes. These rounds are intended to ensure the safety of the inmates and account for all inmates in the unit.

The following activity occurred in Ms. Scopa's cell that afternoon, as depicted on closed-circuit television (CCTV) video footage from within the cell. Around 3:07 p.m., shortly after her arrival in the unit, a correctional officer delivered Ms. Scopa's personal affects to her. At approximately 4:00 p.m., Ms. Scopa was banging on the cell door and yelling for a nurse. Around 4:26 p.m., Nurse Samantha Thomas entered Ms. Scopa's cell to give her anti-nausea medication. Coppinger accompanied Thomas into the cell for security purposes. They left Ms. Scopa's cell about a minute after they entered, without conducting an inspection of any objects in the room.

Cavanagh contends that during Coppinger and Thomas's visit to Ms. Scopa's cell, there was a visible loop of string, specifically a shoelace potentially knotted into a noose, on the floor of Ms. Scopa's cell. The parties agree that a loop of string, whether knotted as a noose or unknotted, in a detainee's cell could be considered by a correctional officer to pose a significant risk of self-harm, although the defendants contend that it does not necessarily pose such a risk. Coppinger says

that he does not have a specific memory of his interaction with Ms. Scopa and that he cannot definitively state whether he observed specific objects on the floor of her cell. He further contends, however, that if he were to see such an object that would pose a serious risk of self-inflicted harm in the cell of a non-mental-health watch detainee, he would take action immediately to prevent such harm.

Between 5:05 and 5:10 p.m., Fitzpatrick assisted in distributing food trays to inmates in the medical housing unit, at the request of Taranto. Ms. Scopa refused her meal. At that time, Fitzpatrick observed Ms. Scopa lying on her side on the bunk in her cell. At approximately 5:20 p.m., when the food trays were being collected in the unit, Fitzpatrick again observed Ms. Scopa lying on her bunk in her cell and, from his perspective, thought she was "okay."

At 5:24 p.m., Ms. Scopa began attempting to hang herself by securing a shoelace fashioned as a noose around the top bunk bed post. She succeeded in hanging herself at 5:28 p.m. and was dead within minutes. None of the officers observed Ms. Scopa again until around 6:10 p.m.[4] At that time, Taranto returned

---

[4] At approximately 5:30 p.m., Taranto had left the unit for his dinner break, during which time Coppinger and Fitzpatrick were responsible for monitoring the inmates in the medical housing unit. From 6:03 p.m. until 6:10 p.m., Coppinger was occupied

from dinner and checked in with Fitzgibbon at the front of the infirmary before returning to the unit officer's station in the medical housing unit to relieve Fitzpatrick, who had taken a break from his one-on-one suicide watch to monitor the unit's inmates overall.

As was his custom upon returning from a break, Taranto conducted a visual check of the three CCTV monitors in the medical housing unit. When he viewed cell #16 on the monitor, he noticed that Ms. Scopa had "her back against the post of the bunk, slouched over in an awkward position." He ran immediately to Ms. Scopa's cell, looked through the window, and saw her "hanging from the bunk with what appeared to be a shoelace around her neck." He sent a radio notification of a "man down" and entered the cell with Coppinger. Taranto and Coppinger took hold of Ms. Scopa and released her from the bunk, removing the shoelace from her neck. Numerous emergency personnel thereafter arrived at the cell, but resuscitation efforts were unsuccessful. Ms. Scopa was transported to Boston Medical Center, where she was pronounced dead. The cause of her death was asphyxia by hanging, brought about by suicide.

_____

with a disruptive detainee in another cell.

## B. *Procedural History*

Cavanagh filed this action on April 26, 2012, against the four correctional officers — Taranto, Fitzgibbon, Coppinger, and Fitzpatrick — in their individual capacities, and against Andrea Cabral and Gerald Horgan in their individual and official capacities as Sheriff of Suffolk County and Superintendent of the Suffolk County House of Correction, respectively. In an amended complaint, filed on December 28, 2012, Cavanagh asserts the violation of 42 U.S.C. § 1983 by all defendants (Count I), supervisory liability under § 1983 by Defendants Cabral and Horgan, and punitive damages under § 1983 (Count VIII), as well as the violation of Mass. Gen. Laws ch. 12, § 11(I) (Counts III and IV), negligence (Count V), wrongful death under Mass. Gen. Laws ch. 229, § 2 (Count VI), and gross negligence (Count VII).

All of the defendants moved to dismiss all counts of the amended complaint, except Count I, pursuant to Fed. R. Civ. P. 12(b)(6).[5] During motion to dismiss practice, the plaintiff sought to preserve only those claims arising under § 1983 (Counts I, II, and VIII), and no longer asserted the state statutory and common law claims alleged in the amended

---

[5] Fitzpatrick retained separate counsel and filed a motion to dismiss only after I ruled on the other defendants' motion to dismiss. I granted Fitzpatrick's motion consistent with my ruling on the motion of the other defendants.

complaint.  I allowed the renewed motion to dismiss as to all

counts except Count I, limiting my substantive consideration to

Counts I, II, and VIII, the counts Cavanagh continued to press.

In dismissing Count II, I determined that Defendants Cabral and

Horgan were subject to qualified immunity, and I accordingly

terminated them as defendants in the case.  I dismissed Count

VIII, which sought punitive damages under § 1983, because such a

damage claim is already embedded in Count I.  The only remaining

claim now is that Defendants Taranto, Fitzgibbon, Coppinger, and

Fitzpatrick individually violated Scopa's constitutional rights

as a pretrial detainee, creating a cause of action under 42

U.S.C. § 1983.

On May 8, 2014, the defendants filed the motions for

summary judgment now before me.[6]  On June 13, 2014, they filed a

motion to strike the plaintiff's expert report from the summary

judgment record on grounds of sanctionably belated disclosure.

At a hearing on these motions,[7] I requested further briefing

---

[6] Fitzpatrick filed his own motion for summary judgment
separately from the other defendants.

[7] The day before the hearing on the defendants' summary judgment
motions, plaintiff's counsel submitted two DVDs with additional
CCTV video footage.  The first DVD provided video footage taken
from the hallway outside of Ms. Scopa's cell — which had not
previously been presented — and the complete video footage from
inside Ms. Scopa's cell, which had been offered in part
previously.  The second DVD contained clips of the video footage
to which the plaintiff wished to draw attention.  The defendants

regarding the factual assertions stemming from the CCTV video footage and the issue of qualified immunity of the remaining defendants.

## II. DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S EXPERT

Because the motion to strike is relevant to the scope of the summary judgment record and arguably material, I will address it first before considering the merits of the summary judgment motions.

### A.   *Background*

#### 1.   The Plaintiff's Expert Disclosures

Cavanagh seeks to include as part of the summary judgment record the expert report of Melvin Tucker, a retired police chief who serves as a litigation expert with regard to correctional facilities.  On December 23, 2013, Cavanagh served a document entitled "Plaintiff's Expert Disclosures" on the

---

objected to the introduction of the DVDs due to their untimeliness.  The only CCTV video footage that was properly part of the summary judgment record is that submitted as Exhibit Z to the defendants' statement of material facts, Dkt. No. 53. The belated submittal of additional materials by plaintiff's counsel after the record on which summary judgment was sought and had been closed and contested in writing is of a piece with his litigation practice — and apparent strategy — of seeking to forestall timely and orderly resolution of the dispositive motion record by untimely submission of additional materials following the conclusion of briefing.  *See infra* Section II.  I decline to consider such vagrant submissions and note in the alternative that the additional video submissions add nothing material to the record.

defendants, reserving the right to supplement it with a full report following the deposition of Thomas, the nurse who entered Ms. Scopa's cell on May 4. In that document, Cavanagh identified Tucker as a potential expert witness, described his education, publications and experience, and indicated the opinions he expected to offer.

Under a revised scheduling order, the plaintiff's full expert disclosures were due February 10, 2014, extended from an earlier disclosure deadline of December 20, 2013. On February 24, 2014, approximately two weeks after the disclosure deadline, Cavanagh supplemented his prior partial expert disclosure with a document entitled "Plaintiff's Supplemental Expert Disclosures." This document is very similar to that served on December 23 but contains some additional information as to Tucker's qualifications and expert testimony.

On May 30, 2014, Cavanagh submitted a draft expert report as an exhibit to his opposition to the defendants' motion for summary judgment. The defendants contend that this is the first time they had seen a report from Tucker. This report was unsigned and lacked lists of Tucker's publications and cases in which he had previously provided expert testimony.

On July 10, 2014, along with his reply to the defendants' motion to strike Tucker's opinion, Cavanagh submitted a full

expert report, apparently disclosing it to defense counsel for the first time and asking that it be substituted for the earlier draft expert report.

### 2. Proposed Expert Testimony

Tucker's opinions are based on his review of depositions and other documents in evidence, his personal knowledge of and experience in the field, and statistical reports regarding national suicide rates in jails. Tucker opines that it should have been obvious to the HOC staff that Ms. Scopa posed a substantial risk of serious harm to herself, and that all HOC staff should have been trained in supervising inmates who are at risk of suicide. He specifically opines that the HOC staff's failure "to take reasonable actions to reduce the risk that Gina Scopa would commit suicide . . . demonstrated a deliberate indifference to [her] safety and well being."

Tucker further opines that national research has established several characteristics that indicate a predisposition to suicide, including having a history of substance abuse and/or mental illness, being placed in a detention facility rather than in a holding facility and in isolation rather than in a shared cell, and being Caucasian. These predisposing factors are referenced to support his opinion that Ms. Scopa presented an obvious suicide risk, and that "a

reasonable intake clinician would have flagged Scopa for removal of shoe laces (or anything else she could have used to hang herself) and would have made sure she was not put in a cell by herself (another inmate to watch her) and would have used the most suicide resistant available cell (with no protrusions to hang from)." Finally, Tucker opines that Coppinger specifically exhibited "a gross misunderstanding of his duties and obligations and a deliberate indifference to [Ms. Scopa's] safety," and that the other correctional officers on duty that day similarly "did not have a clear understanding of the [department] policies and procedures."

The defendants have moved to strike[8] Tucker's expert report, contending that the report does not comport with the requirements of Fed. R. Civ. P. 26(a)(2), and that Tucker lacks the requisite knowledge and expertise to offer the opinions presented therein.

**B. *Analysis***

    1. <u>Timeliness of Disclosure</u>

Federal Rule of Civil Procedure 26(a)(2)(B) requires that expert witness disclosures be accompanied by a written report. This report, prepared and signed by the expert, must be

---

[8] Although Fitzpatrick does not join this motion by the other defendants, my ruling applies equally to him.

submitted at a time ordered by the court and must contain: "(i)
a complete statement of all opinions the witness will express
and the basis and reasons for them; (ii) the facts or data
considered by the witness in forming them; (iii) any exhibits
that will be used to summarize and support them; (iv) the
witness's qualifications, including a list of all publications
authored in the previous 10 years; (v) a list of all other cases
in which, during the previous 4 years, the witness testified as
an expert at trial or by deposition; and (vi) a statement of the
compensation to be paid for the study and testimony in the
case."  Fed. R. Civ. P. 26(a)(2)(B).

Under Fed. R. Civ. P. 37(c)(1), the failure to comply with
the disclosure requirements of Rule 26(a) typically requires a
sanction – a prohibition on the use of the inadequately
disclosed witness to supply evidence on a dispositive motion,
for example – "unless the failure was substantially justified or
is harmless." *See Gay v. Stonebridge Life Ins. Co.*, 660 F.3d
58, 62 (1st Cir. 2011) (stating that "[t]ogether Rules 26 and 37
operate to 'prevent the unfair tactical advantage that can be
gained by failing to unveil an expert in a timely fashion,'" and
noting that a judge has broad discretion in determining which
and whether sanction is appropriate based on considerations of

fairness and justification) (quoting *Poulis-Minott v. Smith*, 388
F.3d 354, 358 (1st Cir. 2004)).

Cavanagh's submissions prior to July 10, 2014, did not meet
the requirements of Rule 26(a).  The draft expert report
submitted on May 30, 2014, three and a half months after the
disclosure deadline, did not contain Tucker's signature, copies
of the exhibits relied on and referenced in the report, a
statement of Tucker's qualifications in the form of a C.V., a
list of all recent publications, or a list of all recent cases,
as required by Rule 26(a)(2)(B).  Similarly, the disclosures
provided on December 23, 2013, before the disclosure deadline,
and on February 24, 2014, two weeks after the deadline, did not
satisfy the requirement that a written expert report accompany
the disclosures.

Cavanagh contends that any failure on his part to comply
with Fed. R. Civ. P. 26(a)(2) was substantially justified or
otherwise harmless to the defendants, see Fed. R. Civ. P.
37(c)(1), and that his good faith effort to comply with the rule
should permit the full expert report to stand.  I disagree.

Cavanagh has offered no reasonable explanation for delaying
to submit the expert report.  He contends that he could not
provide all the necessary materials to Tucker for review until
after Thomas was deposed.  When Thomas did not appear for her

deposition sometime prior to the February 10, 2014 expert disclosure deadline — an issue that Cavanagh did not bring to my attention in connection with a request for a deadline extension — Cavanagh determined that it would be necessary to prepare Tucker's report without Thomas's testimony.  Cavanagh asserts that he believed that his supplemental disclosure on February 24, 2014 satisfied the requirements of Rule 26(a), and that this submission was justifiably delayed by his efforts to locate and depose Thomas.

Lawyers are expected to know the rules governing discovery and motion practice in federal courts and in this district. That Cavanagh believed – wrongly – that his February 24 submission complied with the rule does not serve to justify its inadequacy.  Nor do the apparent difficulties in deposing Thomas justify the delay in full disclosure, where Cavanagh was aware of this issue before the disclosure deadline and could have brought it to my attention for purposes of relief from the deadline.  This was plainly unjustified and unreasonable.  *See Pan Am. Grain Mfg. Co.* v. *P.R. Ports Auth.*, 295 F.3d 108, 117 (1st Cir. 2002) ("A substantial justification is one that 'could satisfy a reasonable person.'" (citation omitted)); *see also AVX Corp.* v. *Cabot Corp.*, 251 F.R.D. 70, 78 (D. Mass. 2008) (lack of receipt of certain discovery information did not substantially

justify late disclosure of all materials, but only those directly impacted by lack of receipt); *cf. Harriman v. Hancock Cnty.*, 627 F.3d 22, 30 (1st Cir. 2010) (affirming preclusion of affidavits of two witnesses from inclusion in summary judgment record, because plaintiff "knew very early on" that the two witnesses "could help his case" but "made no meaningful attempt to find [the witnesses] until after discovery closed" and "took no steps to minimize the harm caused by the late disclosure").

However, an unjustifiably delayed disclosure will merit exclusion of the delayed evidence under Rule 37(c) only if the delay also causes some harm or prejudice to the opposing party. *See Gagnon* v. *Teledyne Princeton, Inc.*, 437 F.3d 188, 197 (1st Cir. 2006). Delay is not harmless when the ultimate disclosure occurs "after the close of discovery," leaving the defendant "without the means to explore and challenge the basis of" the late-disclosed evidence. *AVX Corp.*, 251 F.R.D. at 78 (noting that concept of "harmless" under Rule 26 is a "fairly limited" one (citations omitted)); *see Harriman*, 627 F.3d at 31 ("late disclosure was not a harmless inconvenience" because defendants had "prepared and filed a summary judgment motion premised on evidence submitted before the discovery deadline"). Here, Cavanagh supplied a draft expert report only as an exhibit to his opposition to the defendants' summary judgment motion, and

supplied the full expert report only in opposition to the motion

to strike the draft report; both disclosures occurred well after

the close of discovery and after summary judgment submissions

premised on an evidentiary record from which the expert report

was absent.  Although the initial disclosure provided by

Cavanagh in December 2013 gave the defendants some sense of what

Tucker's testimony and opinions would be, this does not

substitute for the complete report required under Rule 26(a).

*Cf. Cranberry Commons, Ltd. v. Orograin Bakeries, Inc.*, Civ.

Action No. 11-11654-RWZ, 2013 WL 5441571, at *3 (D. Mass. 2013)

(late disclosure of relevant insurance policies during summary

judgment proceedings rather than pretrial proceedings was not

harmless because the policies "change[d] the state of the record

on [the] matter" and therefore imposed meaningful burden without

substantial justification on defendant).  I find that the

delayed disclosure was not harmless.

    To be sure, it would be possible now to take the time and

make the additional effort for the defendants in an effort to

overcome any adverse effects stemming from the delayed

disclosure.  But Cavanagh has offered no justification for the

late disclosure, instead simply disregarding clear court-imposed

deadlines and failing to review the applicable federal rules,

and has not demonstrated any need for the late evidence, as will

19

be discussed briefly below.  *See Harriman*, 627 F.3d at 30
(discussing relevant factors for determining sanction under rule
37 (citing *Esposito* v. *Home Depot U.S.A., Inc.*, 590 F.3d 72, 76
(1st Cir. 2009); *Macaulay* v. *Anas*, 321 F.3d 45, 51 (1st Cir.
2003)).  This delay impeded the efficient travel of this case
and that of other cases on my docket.  *See Santiago-Díaz* v.
*Laboratorio Clínico y de Referencia del Este and Sara López,
M.D.*, 456 F.3d 272, 277 (1st Cir. 2006) ("Whenever a party,
without good cause, neglects to comply with reasonable
deadlines, the court's ability to manage its docket is
compromised.").  The practice of plaintiff's counsel in making
disorderly and untimely proposed additions to the closed
evidentiary record merits no indulgence.  *See supra* note 7.
With these considerations in mind, I conclude that the proper
sanction for the delayed disclosure here is the preclusion of
the untimely evidence.  Accordingly, as the first and principal
grounds, I will grant the defendants' motion to strike the
expert report on the basis that it was untimely and should not
be considered in my review of the motions for summary judgment.

   2.  Expert Qualification Requirements

   Even if Tucker's expert report were not precluded on
untimeliness grounds, much if not all of it would be excluded

due to Tucker's lack of qualifications to testify to numerous of the opinions he offers in his report.

Expert testimony that is based on scientific, technical, or specialized knowledge must comply with Fed. R. Evid. 702, which requires that such testimony be "based upon sufficient facts or data" and the result of the expert's reliable "application of [reliable] principles and methods . . . to the facts." An expert providing such testimony must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Consistent with Rule 702, scientific or specialized expert testimony must be excluded if it is unreliable or irrelevant. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 591-95 (1993).

The defendants challenge the substance of Tucker's opinions on two grounds. First, they assert that Tucker lacks the requisite knowledge, experience, and skill to opine on the mental health of Ms. Scopa at the time of her detainment, taking particular issue with Tucker's effort to provide a mental health evaluation of Ms. Scopa. I agree. Although I find Tucker's qualifications potentially adequate for stating an opinion as to appropriate correctional institution policies and protocols for ensuring inmate safety, Cavanagh has not laid the proper

foundation for the admission of the portion of Tucker's expert testimony evaluating Ms. Scopa's mental health. Tucker points only to general national statistics, some of which are not even indicative of a greater suicide risk, as support for his opinion that Ms. Scopa possessed certain predisposing characteristics that made her at an obvious risk for suicide. Cavanagh has accordingly not met his burden of demonstrating that Tucker's opinion on this issue is the product of the application of reliable principles and methods, or that his experience "is a sufficient basis for the opinion." *See* Fed. R. Evid. 702; *see also Brown v. Wal-Mart Stores, Inc.*, 402 F. Supp. 2d 303, 308-309 (D. Me. 2005).

Second, the defendants contend that many of Tucker's opinions are irrelevant to this action. I agree with this conclusion as well. The assertions, for example, that the supervisory staff failed to train the correctional officers properly as to suicide prevention and that a reasonable mental health clinician would have deemed Ms. Scopa to pose a suicide risk, are irrelevant to the question whether the correctional officers who are defendants here were deliberately indifferent to a serious risk posed by Ms. Scopa. *See* Fed. R. Evid. 402. These opinions simply do not have a "valid . . . connection to the pertinent inquiry" of whether the particular defendants here

had actual knowledge of Ms. Scopa's serious risk of self-harm and were deliberately indifferent to that risk. *See Cipollone v. Yale Indus. Prods.*, 202 F.3d 376, 380 (1st Cir. 2002).

Accordingly, I will grant the motion to strike, noting also that — even if considered — Tucker's report would not forestall summary judgment for the defendants. *See infra* note 14.

### III. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

The only remaining theory of liability in this matter is that the four correctional officers violated Ms. Scopa's constitutional rights as a pretrial detainee in violation of 42 U.S.C. § 1983 by acting in deliberate indifference to her substantial, known risk of serious self-inflicted harm, through three failures or omissions: (1) failing to recognize obvious characteristics indicating Ms. Scopa's predisposition to suicidal tendencies, classify her as suicidal, and implement the procedures accompanying this classification, including removing her shoelaces and placing her in a suicide-resistant cell; (2) failing to conduct proper and timely cell checks and rounds in accordance with the unit's policy requiring irregular thirty-minute checks; and (3) on the part of Coppinger, failing to notice - when he entered Ms. Scopa's cell an hour before her death - an obvious white loop on the floor resembling a noose that presented a clear and serious risk of harm to Ms. Scopa.

23

The defendants contend that they are entitled to summary judgment because there is no triable issue of fact that would permit a jury to find in Cavanagh's favor. Specifically, they assert that they had no knowledge that Ms. Scopa presented a risk of suicide and therefore were not deliberately indifferent to that risk; that any failure to conduct timely and sufficiently thorough cell checks was not a proximate cause of Ms. Scopa's death; and that Coppinger did not observe the object on the floor that presented a risk to Ms. Scopa's safety and therefore did not have the knowledge required for liability under the deliberate indifference standard.[9] In their supplemental briefing at my direction, the defendants also assert that they are entitled to qualified immunity from all of the alleged violations. As will appear below, I find the qualified immunity inquiry best captures the resolution of the defendant's contested liability here.

**A. _Standard of Review_**

The purpose of summary judgment practice is "to pierce the pleadings and to assess the proof in order to see whether there

---

[9] In the memorandum Cavanagh filed following the motion hearing in this matter, he indicated that he no longer opposes Fitzgibbon's motion for summary judgment. Nonetheless, it is my obligation to assess whether summary judgment is warranted for each defendant on the record before me. _See_ Fed. R. Civ. P. 56(e); Fed. R. Civ. P. 56(e), committee notes on Rules – 2010 amendment.

is a genuine need for trial." *Garside v. Osco Drug, Inc.*, 895
F.2d 46, 50 (1st Cir. 1990) (citation omitted). Summary
judgment is appropriate when, after a sufficient time for
discovery, the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits "show[ ] that there is no genuine dispute as to any
material fact and [that] the moving party is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a).

A "genuine" issue is one that, based on the supporting
evidence, "a reasonable jury could resolve . . . in favor of the
non-moving party," and a "material" fact is one that has "the
potential to affect the outcome of the suit under the applicable
law." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)
(citations and quotation marks omitted).

If the moving party satisfies the burden of showing, based
on evidentiary material, that there is no genuine issue of
material fact, the burden shifts to the nonmoving party to
demonstrate by reference to specific facts "that a reasonable
jury could return a verdict for the nonmoving party." *Anderson
v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Celotex
Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "[C]onclusory
allegations, improbable inferences, and unsupported
speculations" are insufficient to establish a genuine dispute of

fact. *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). When reviewing a motion for summary judgment, I view the facts "in the light most favorable to the non-moving party." *Zambrana-Marrero v. Suarez-Cruz*, 172 F.3d 122, 125 (1st Cir. 1999).

## B. *Qualified Immunity*

During motion to dismiss practice, the defendants asserted that they were entitled to qualified immunity from all of the plaintiff's claims. In addressing the defendants' renewed motion to dismiss, I did not take up the question of qualified immunity as to the only count that I determined would remain – Count I – because the defendants conceded that the count stated a claim upon which relief may be granted. Perhaps thinking that my decision implicitly rejected their qualified immunity arguments even after evidentiary development, the defendants did not raise this defense again in their initial summary judgment submissions. At the hearing on the summary judgment motions, however, I directed the submission of briefing on the qualified immunity issue and now consider whether the remaining defendants are entitled to summary judgment on that basis.

### 1. Legal Standard

The doctrine of qualified immunity shields "[g]overnment officials performing discretionary functions . . . from

26

liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 (1982). It provides "immunity from suit and not a mere defense to liability." *Maldonado* v. *Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009). The test for the applicability of qualified immunity consists of two prongs: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado*, 568 F.3d at 268-69 (citing *Pearson* v. *Callahan*, 555 U.S. 223, 236 (2009)).

In an effort to maximize the efficient use of judicial resources, the Supreme Court has stated that it is not necessary to analyze the first prong of the qualified immunity test where doing so will "have no effect on the outcome of the case." *Pearson*, 555 U.S. at 236-37. Accordingly, judges have discretion to bypass the direct constitutional question posed by the first prong of the qualified immunity test when the case can be resolved through the second prong. *See id.; Maldonado*, 568 F.3d at 270. I will exercise that discretion here.

The second prong of the test assesses "whether the state of the law at the time of the alleged violation gave the defendant

27

fair warning that his particular conduct was unconstitutional."
*Maldonado*, 568 F.3d at 269.  This prong contains two parts: "(a)
whether the legal contours of the right in question were
sufficiently clear that a reasonable officer would have
understood that what he was doing violated the right, and (b)
whether in the particular factual context of the case, a
reasonable officer would have understood that his conduct
violated the right." *Mlodzinksi* v. *Lewis*, 648 F.3d 24, 33 (1st
Cir. 2011).  The first part "focuses on the clarity of the law
at the time of the alleged civil rights violation," while the
second part "focuses more concretely on the facts of the
particular case." *Maldonado*, 568 F.3d at 269.

   2. Analysis

      *a. Clearly Established Right*

   It was and is clearly established that "police officers
violate the fourteen amendment due process rights of a detainee
if they display a 'deliberate indifference' to the unusually
strong risk that a detainee will commit suicide."[10]  *Bowen* v.
*City of Manchester*, 966 F.2d 13, 16 (1st Cir. 1992) (collecting

---

[10] As a formal matter, constitutional due process rights of
pretrial detainees are protected by the Fourteenth Amendment,
not the Eighth Amendment, as Cavanagh alleges.  *Burrell v.
Hampshire Cnty.*, 307 F.3d 1, 7 (1st Cir. 2002).  That said,
however, the same substantive standard of deliberate
indifference applies whether the Eighth or Fourteen Amendment
provides the source of the rights.  *Id.*

cases); *see Lucia* v. *City of Peabody*, 971 F. Supp. 2d 153, 163 (D. Mass. 2013) ("[I]t is clearly established that § 1983 imposes liability for serious physical harm or death only where the defendant acts intentionally or with 'deliberate indifference' to the deprivation of the victim's constitutional right." (citing *Manarite* v. *City of Springfield*, 957 F.2d 953, 955 (1st Cir. 1992), and other cases)). Accordingly, the right alleged to have been violated was clearly established, at least in a general sense, in controlling authorities at the time of Ms. Scopa's suicide. *See Decotiis* v. *Whittemore*, 635 F.3d 22, 37 (1st Cir. 2011).

Establishing "deliberate indifference" requires proof of "(1) an unusually serious risk of harm (self-inflicted harm, in a suicide case), (2) defendant's actual knowledge of (or, at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk." *Manarite*, 957 F.2d at 956; *see Bowen*, 966 F.2d at 16-17. Deliberate indifference accordingly requires both an objectively and "sufficiently serious" alleged deprivation — meaning that the inmate "is incarcerated under conditions posing a substantial risk of serious harm" — and a "sufficiently culpable state of mind" on the part of the officer. *Farmer v. Brennan*, 511 U.S. 826, 834 (1994) (internal quotation marks and

29

citations omitted); *see Estelle v. Gamble*, 429 U.S. 97, 104-05
(1976).

### b. What an Objectively Reasonable Official Would Believe Under the Circumstances

Although the right Cavanagh alleges is clearly established,
to avoid qualified immunity the bounds and contours of a
violation of that right must also be sufficiently clear such
that *no* reasonable official could believe that the conduct of
these officers at the time constituted deliberate indifference
and therefore a violation of Ms. Scopa's constitutional right.
Qualified immunity "protects all but the plainly incompetent or
those who knowingly violate the law." *Ashcroft* v. *al-Kidd*, 131
S. Ct. 2074, 2085 (2011) (internal quotation marks and citations
omitted). If *any* reasonable official could reasonably have
believed — on the basis of the facts known at the time — "that
no violation existed," the defendant official is entitled to
immunity. *Dirrane* v. *Brookline Police Dep't*, 315 F.3d 65, 69
(1st Cir. 2002). A public official does not benefit from
qualified immunity, however, where "existing precedent [has]
placed the statutory or constitutional question beyond debate."
*al-Kidd*, 131 S. Ct. at 2083 (where "'[t]he contours of [a] right
[are] sufficiently clear' that every 'reasonable official would
have understood that what he is doing violates that right,'" an

30

official is not entitled to qualified immunity (quoting *Anderson
v. Creighton*, 483 U.S. 635, 640 (1987) (alterations in
original)).

Under this standard, the question is whether *any* reasonable
officer in the position of each of the defendants at the time
would have reasonably believed that "his actions, or willful
failure to act, amounted to 'deliberate indifference' to the
serious risk" that Ms. Scopa would harm herself.  *Bowen*, 966
F.2d at 13.  I consider each of the identified violations –
viewing the record in the light most favorable to the plaintiff
– in turn.

> i.    *Deliberate Indifference to Ms. Scopa's Mental
>       Health History and Needs*

Cavanagh initially contended that all four defendants
recklessly disregarded certain indicators and predisposing
factors that should have warned the officers that Ms. Scopa
posed a risk of self-harm.[11]  There is simply no evidence to

---

[11] In addition to conceding that summary judgment may enter as to
the claim against Fitzbibbon, *see supra* note 9, Cavanagh scales
back on this argument generally in his supplemental briefing,
stating that it is irrelevant whether Ms. Scopa was placed on a
mental health watch because the duty to investigate dangerous
objects applies to all inmates.  This reformulation, however, is
simply another way of asserting that the defendants should have
known that Ms. Scopa would or did possess a dangerous object.
This assertion is inextricably tied to the premise that an
object permissibly possessed by Ms. Scopa – her shoelaces – was
rendered dangerous by her mental health issues.

support this contention or to demonstrate that any reasonable officer in the defendants' position would have known that his or her inaction constituted a violation of Ms. Scopa's right.

It is undisputed that Ms. Scopa was never identified as a suicide risk within the HOC, either through a formal process or through informal observations by the HOC staff.[12] Indeed, Musandipa, the nurse who evaluated Ms. Scopa's condition upon her arrival at the medical housing unit on the day of her suicide, testified that she was surprised to learn that Ms. Scopa had committed suicide. It is also undisputed that the defendants did not have access to Ms. Scopa's medical or mental health records; accordingly, they would not have known about her history of mental illness or even the details of her recent drug use.

Although other HOC staff, such as the clinicians who evaluated Ms. Scopa on her initial intake and her intake into the medical housing unit, may have known that these factors can correlate with suicidal ideations, there is no evidence that the defendant officers were aware of such correlations, their

---

[12] That Ms. Scopa never received the mental health evaluation for which she was referred at initial intake – and at which she arguably could have been flagged for a mental health watch based on her depression and recent hospitalizations for drug overdoses – is not a failure attributable to *these* defendants, who have no involvement with or access to the mental health screening process.

validity as a predictive measure of suicide risk, or their application to Ms. Scopa. In fact, it is undisputed that the defendants were not trained to make such assessments. There is no genuine dispute, therefore, that the defendants did not have actual knowledge of Ms. Scopa's risk of self-harm.[13]

Mere failure to perceive a significant risk does not satisfy the knowledge requirement for deliberate indifference unless the risk is so obvious or the "acts or omissions [are] so dangerous" that a defendant's knowledge can be inferred. *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988); *see Farmer*, 511 U.S. at 838, 839, 842; *Manarite*, 957 F.2d at 956. In the absence of actual knowledge, Cavanagh has

---

[13] Nor do the interactions by three of the defendants with Ms. Scopa demonstrate that they were on notice of any mental instability, especially where they had limited or no contact with her. Fitzgibbon was not in the medical housing unit but rather was working in the front of the infirmary. Consequently, he had no interaction with Ms. Scopa or any responsibilities toward her. Fitzpatrick was assigned to conduct a one-on-one observation of another inmate, and interacted with Ms. Scopa only when he was asked to assist with dinner distribution. Taranto similarly had no interaction with Ms. Scopa until after her death. Cavanagh raises some evidence that Taranto held a supervisory role, but not enough to create a genuine dispute. Although it may be plausible to assert that Taranto could have, through his own omissions as a supervisor, neglected to attend sufficiently to the mental health needs of Ms. Scopa, Cavanagh has not adduced specific facts supporting such a claim. *See Whitfield v. Melendez-Rivera*, 431 F.3d 1, 14 (1st Cir. 2005). As to Coppinger, his interaction with Ms. Scopa will be discussed in greater detail below.

not offered any admissible evidence that Ms. Scopa's risk was so

obvious that the defendants' knowledge can be inferred.[14]

In *Bowen*, another jail suicide case, the First Circuit

concluded that even if a correctional officer had been trained

in suicide screening, there was no evidence that he could have

prevented the suicide of an individual who exhibited no

manifestations of suicidal potential to the officer. *Bowen*, 966

---

[14] Cavanagh asserts that numerous of Ms. Scopa's characteristics, including her ethnicity, her need for detoxification due to recent consumption of psychotropic medication, her history of mental illness, and her placement in an isolated cell within a detention facility (as opposed to a shared cell in a holding facility), rendered her an obvious suicide risk, based on national statistics on the characteristics of individuals who commit suicide in jail. The only evidence he offers in support of these statistics is the expert report of Tucker, which I have stricken from the summary judgment record. *See supra* Section II.

Even if Cavanagh had presented admissible evidence of these predisposing factors, he has not presented evidence that would impute knowledge of these factors to the officers in order to satisfy the knowledge requirement for deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 826, 842 (1994) (refining earlier analysis employed in *Elliot v. Cheshire Cnty.*, 940 F.2d 7, 10-11 (1st Cir. 1991), and stating that risk may be imputed to official for purposes of establishing actual knowledge where risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it" (citation omitted)). To the extent Cavanagh contends that Ms. Scopa's suicide risk was obvious because of predisposing factors of which the defendants should have been aware, that claim is unsupported. Indeed, the belated effort to support the proposition with expert testimony from Tucker underscores his recognition that such predisposing factors require expertise for understanding.

F.2d at 17-18.  As in *Bowen*, Ms. Scopa's risk of suicide or need

for immediate mental health attention was neither diagnosed by a

qualified professional nor so obvious that someone other than

such a professional could have recognized a risk.  *See id.*  In

*Bowen*, the First Circuit concluded that the officer was entitled

to qualified immunity because "it was not obvious that [his]

conduct" – that is, his failure to identify signs that the

decedent was at high risk of committing suicide - "violated

clearly established law."  *Bowen*, 966 F.2d at 17-18; *cf. Drake

ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)

(concluding that failure to remove bedding and clothing was not

an unreasonable decision by correctional officers "in light of

the risks as the jailers understood them at the time").

Similarly here, Cavanagh has not adduced any evidence that

would permit a reasonable fact-finder to conclude that these

defendants had actual knowledge of Ms. Scopa's risk of suicide

or were willfully blind to that risk.  Under these

circumstances, a reasonable official in the shoes of these

defendants would not believe that his or her failure to identify

Ms. Scopa as presenting a risk of harming herself constituted a

violation of her constitutional right.  *See Maldonado*, 568 F.3d

at 269; *Bowen*, 966 F.2d at 17-18.  Indeed, the case law at the

time made clear that the defendants' conduct, absent more, would

*not* constitute deliberate indifference.  *See Bowen*, 966 F.2d at

17-18; *see also Elliott* v. *Cheshire Cty.*, 940 F.2d 7, 10-11 (1st

Cir. 1991) (collecting cases establishing centrality of

knowledge of risk of harm to deliberate indifference standard

and staing that "there can be no deliberate indifference if the

defendants are unaware that the detainee poses a risk of harm to

himself").  Accordingly, to the extent Cavanagh's § 1983 claim

is based on the defendants' purported deliberate indifference to

the serious risk Ms. Scopa posed to herself by not taking

certain protective steps appropriate for someone identified as

suicidal, the defendants are entitled to qualified immunity.

> ii.  *Deliberate Indifference Through
>       Inadequate Cell Checks*

Cavanagh asserts that the defendants' failure to conduct

proper cell checks at irregular thirty-minute intervals also

constituted deliberate indifference to Ms. Scopa's safety and

her serious risk of self-harm.  There is arguably a genuine fact

dispute as to when the cell checks were conducted and whether

they complied with HOC policy.[15]  Construing the record in the

---

[15] Rounds in the medical housing unit at the HOC are to be
conducted for non-mental-health watch inmates at irregular
thirty-minute intervals, and are to be documented in the unit
logbook.  No rounds were recorded in the logbook after 3:07 p.m.
on the day of Ms. Scopa's death.  The defendants assert that
they considered the distribution and collection of food trays,
which occurred at 5:03 p.m. and 5:19 p.m., respectively, to

light most favorable to the plaintiff and assuming that the
rounds were not conducted in compliance with HOC policy, the
question is whether any reasonable officer, under the
circumstances, would have known that the failure to conduct cell
checks at the required intervals constituted deliberate
indifference to Ms. Scopa's constitutional right.

As discussed above, Cavanagh has not adduced any evidence
demonstrating that the defendants had actual knowledge of or
were willfully blind to Ms. Scopa's risk of self-harm.  Such
knowledge is required for any deliberate indifference claim.
*See Farmer*, 511 U.S. at 837; *Burrell v. Hampshire Cnty.*, 307
F.3d 1, 7 (1st Cir. 2002); *Calderon-Ortiz* v. *LaBoy-Alvarado*, 300
F.3d 60, 65 (1st Cir. 2002).  A reasonable officer under the
circumstances here would understand that cell checks are for the
purpose of ensuring inmate safety, but would be unaware that Ms.
Scopa had any suicidal predisposition and would not be looking
for specific signs of self-harm.  Where "[t]he focus is on what
the jailers knew and what they did in response," *Burrell*, 307

---

constitute cell checks that adequately substituted for rounds.
The defendants further contend that cell checks were performed
at 3:37 p.m., 4:08 p.m., 4:20 p.m., 4:21 p.m., 4:25 p.m., 5:03
p.m., and 5:19 p.m., based on the CCTV footage.  However, a
sheriff's department investigator concluded that unit rounds
were not timely completed on the afternoon of May 4, 2009.
There is accordingly a genuine fact dispute regarding what
constitutes an adequate cell check during routine rounds and
whether this standard was met.

F.3d at 8, a reasonable officer under the circumstances would not have understood that the failure to comply with the precise guidelines for irregular cell checks, either in timing or in substance, violated Ms. Scopa's constitutional right to proper monitoring. *See Lucia*, 971 F. Supp. 2d at 165-66 (reaching same conclusion).

Indeed, the existing case law at the time suggested that inadequate cell checks would not serve as a basis for liability for a suicide absent other indicators of suicidal risk. *See Bowen*, 966 F.2d at 15-18 (detainee left unattended in lockup for 45-50 minutes committed suicide, and court concluded that officer was negligent in not conducting required checks every fifteen minutes, but failure did not "rise to the level of a 'deliberate indifference' claim"); *Dobson v. Mangusson*, 923 F.2d 229, 230 (1st Cir. 1991) (officer's failure to complete two regular cell checks could be considered "forgetful" or "faulty" but not "so faulty as to indicate indifference, deliberate or otherwise," even where the detainee was placed on a fifteen-minute watch due to another officer's concern that the detainee appeared suicidal). Accordingly, to the extent Cavanagh's § 1983 claim is based on the defendants' purported failure to conduct proper cell checks, the defendants are entitled to qualified immunity.

Finally, I turn to whether Coppinger is entitled to

qualified immunity for his action or inaction while inside Ms.

Scopa's cell.  As a threshold matter, I assume for the purposes

of this analysis that a reasonable officer would have observed a

looped shoelace on the floor of Ms. Scopa's cell, which is a

genuinely disputed fact here, and further that Coppinger's

failure to notice the shoelace, examine it further to determine

if it was knotted as a noose, and remove it from Ms. Scopa's

cell constituted deliberate indifference to or willful disregard

of a clear, serious risk of harm to Ms. Scopa.[16]  In other words,

---

[16] I make this assumption despite questions of fact on the record
before me, namely, whether the object on the floor was in the
shape of a loop or noose, and whether it could not go unobserved
to someone who entered the cell, including a reasonable officer
with Coppinger's knowledge, experience, and characteristics at
the time.
     A review of the CCTV footage, to the extent what it depicts
can be deciphered, could support the following narrative.
Before Coppinger enters the cell, Ms. Scopa can be seen dropping
an object on her bed, but it is unclear what the object is.  At
the time Coppinger and Thomas arrive, there are several, largely
unidentifiable, items on the floor by Ms. Scopa's bed.  One of
the objects could plausibly be a loop.  At 4:25 p.m., the cell
door opens, and Thomas stands in the doorway talking to Ms.
Scopa.  Coppinger is visible but does not enter the room until
after the nurse approaches Ms. Scopa.  Coppinger walks within
approximately two feet of Ms. Scopa's bunk, over the objects on
the floor, and toward the window on the far side of the bed.
Thomas turns her back to Coppinger and Ms. Scopa, appearing to
prepare the medication. Coppinger variably looks out the window
and back at Ms. Scopa while Thomas administers the medication.

                                   39

I assume without deciding that the first prong of the qualified immunity test is satisfied. The critical question under the second prong is whether *any* objectively reasonable correctional officer who had Coppinger's knowledge at the time and entered the cell as Coppinger did would know that failing to observe such an object on the floor of the cell, and failing to take responsive action to ensure the detainee's safety, violated the detainee's constitutional right.

The parties do not dispute that a looped shoelace in an inmate's cell *could* be considered by a correctional officer to pose a significant risk of self-harm. Cavanagh has not demonstrated, however, that it was clearly established under the case law at the time that a looped shoelace, under these circumstances, would necessarily be considered a dangerous object, and that the failure to remove it and take further action would constitute deliberate indifference.

It is clear from the case law that deliberate indifference requires more than mere negligence. *Farmer*, 511 U.S. at 835. A reasonable response to a risk, "even if the harm ultimately was

_____

Thomas leaves the room, and Coppinger appears to have a brief exchange with Ms. Scopa (or at least to have looked at her) and then follows Thomas out of the room. Based on this plausible narrative, I find that reasonable fact-finders viewing the CCTV footage could reach different conclusions on what Coppinger saw or should have seen.

not avoided," is not actionable.  *Burrell*, 307 F.3d at 7.

Rather, the official must have engaged in acts or omissions akin

to "subjective recklessness," or reckless or conscious

disregard.  *Farmer*, 511 U.S. at 836, 839-840; *see Manarite*, 957

F.2d at 957.  A threshold requirement for reckless or conscious

disregard is some knowledge or constructive notice of a risk of

harm.  Critical here — as with the discussions of the other

theories of liability — is the fact that Coppinger and the other

defendants had no reason to believe that Ms. Scopa would harm

herself.  *See Elliott*, 940 F.2d at 10-11.  Even if Coppinger had

observed the loop on the floor, he had no previous knowledge to

connect that loop to a risk of harm, nor is there any evidence

that Ms. Scopa's behavior while he was in her cell did or should

have put Coppinger on notice of such a risk.[17]  Under these

circumstances, it is not sufficiently clear that a visible,

looped shoelace on the cell floor would be an adequately strong

indicator that Ms. Scopa considered harming herself.  Indeed, in

*Torraco* v. *Maloney*, 923 F.2d 231, 236 (1st Cir. 1991), a case on

which reasonable officers could rely for guidance, the First

---

[17] There is some indication in the record that Coppinger had an
earlier interaction with Ms. Scopa that afternoon in which she
requested medical attention and informed Coppinger that she was
undergoing detoxification for methadone.  This interaction,
standing alone, would not have put Coppinger on notice of any
suicidal predisposition Ms. Scopa may have been exhibiting,
however.

Circuit stated that "[a] finding of deliberate indifference requires a strong likelihood, rather than a mere possibility, that self-infliction of harm will occur."  A reasonable officer in Coppinger's position would not necessarily think that his failure to take action in response to the looped shoelace was "so inadequate as to shock the conscience" or in reckless disregard of Ms. Scopa's safety and therefore would rise to the level of a violation of Ms. Scopa's right. *See Sires* v. *Berman*, 834 F.2d 9, 13 (1st Cir. 1987); *see also Manarite*, 957 F.2d at 956.

Accordingly, at the time of Ms. Scopa's death it was not "beyond debate" that failing to take action in response to viewing a looped shoelace on the floor of a detainee's cell, absent any other indicators of suicidal tendencies, was so clear a violation of the detainee's Eighth or Fourteenth Amendment right that "every 'reasonable official would have understood'" that this inattention violates that right. *al-Kidd*, 131 S. Ct. at 2083 (quoting *Anderson*, 483 U.S. at 640); *see Ford* v. *Bender*, 768 F.3d 15, 23, 27 (1st Cir. 2014).  Coppinger is therefore entitled to qualified immunity as to all of the violations alleged under the § 1983 claim.

## IV. CONCLUSION

The circumstances which give rise to this case are tragic.
But tragedy does not justify disregard of orderly processes for
the timely resolution of liability.  Nor does tragedy overcome
well-settled legal principles which guide the resolution of
liability.  Based on the summary judgment record before me,
liability may not be imposed upon the four correctional officer
defendants.

For the reasons set forth above, it is hereby ORDERED that:

The correctional officer defendants' motion to strike the
plaintiff's expert report, Dkt. No. 66, is GRANTED, and it is
further ORDERED that

The motion for summary judgment in favor of Defendants
Taranto, Fitzgibbon, and Coppinger, Dkt. No. 51, and the motion
for summary judgment in favor of Defendant Fitzpatrick, Dkt. No.
54, are GRANTED.


*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE